Filed 10/15/25  P. v. Ramnanan CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E085326 |
| v. | (Super.Ct.No.  FBA4939) |
| ANDRE RAMNANAN, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Gregory S. Tavill, Judge.  Affirmed.

Andre Ramnanan, in pro. per.; and Annie Fraser, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

1

## I.

## INTRODUCTION

Defendant and appellant Andre Ramnanan appeals from the trial court's postjudgment order denying his petition for resentencing of his 1996 first degree murder (Pen. Code,[1] § 187, subd. (a)) and attempted murder (§§ 664/187) convictions under section 1172.6 after issuing an order to show cause. Although this is an appeal from a postconviction order, appointed counsel has filed a brief under the authorities of *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*) and *Anders v. California* (1967) 386 U.S. 738 (*Anders*), and not under *People v. Delgadillo* (2022) 14 Cal.5th 216 (*Delgadillo*), requesting this court to conduct an independent review of the record.

Appellate counsel argues that "[w]hile this appeal involves Penal Code section 1172.6 proceedings, the limitations set forth in *People v. Delgadillo* [ ] do not apply because the superior court denied the petition after issuing an order to show cause." (Bold and underscore omitted.) In addition, defendant has had an opportunity to file a supplemental brief with this court and has done so.

We need not determine whether this appeal should be determined under *Delgadillo* or *Wende* because, after considering the arguments raised in defendant's supplemental brief, and exercising our discretion to conduct an independent review of the record, defendant's appeal fails. We thus affirm the trial court's postjudgment order denying defendant's section 1172.6 petition.

---

[1] All future statutory references are to the Penal Code.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual Background*

    1. Trial Testimony

During a joint trial, Donald Gray testified that on December 3, 1992, defendant asked him to drive him to go shooting in the desert in Yermo.[2] They went with codefendant Richard Gamache, who brought guns, and they shot at signs and some items on the ground. Richard and defendant said they were going to take a trailer, like a mobile home, and they were going to take some horses. Richard and defendant discussed that if the guy gave them any problems, they would tie them up and shoot them.

Peggy Williams lived in Yermo, California, with her husband, Lee Williams (collectively "Williams"). On December 3, 1992, Peggy went to bed around 10:00 p.m. and was awakened by a knock at the door. She woke up her husband Lee who answered the door. Peggy walked into the kitchen area, where she saw codefendant Tammy Gamache (Richard's wife) using the telephone. Richard grabbed Peggy from behind, and had a gun to her right temple, which made a clicking sound right before he grabbed her. Richard had his arm wrapped around Peggy's neck. He told her to lie on the floor and guided her to the floor with the gun to her head. He told her to keep her face down. One of the other cohorts had a gun pointed at Lee's head. Richard told Lee that if he did not

_____

[2] On July 16, 2025, we granted defendant's request to take judicial notice of the trial transcripts in case No. E018243. The trial transcripts from the trial will be referred to as "TT."

3

cooperate, they would "kill his old lady." Richard used the name "Tony" and defendant used the name "Ruben." Peggy testified that defendant had a gun.

Richard asked Lee if he had duct tape, and Lee said no. Richard asked Lee if there were guns in the house, and he said yes. Peggy believed her hands were bound with shoe strings. Tammy asked about the Williamses horses—where the halters, saddles and blankets were kept, how often they were fed, what they were fed, and if they responded to voice or leg commands. Tammy stated later that she was able to easily hookup the trailer to the truck.

Defendant and his cohorts went through the Williamses safe and the bedroom, pulling open drawers and ransacking the residence. Peggy described them as having a good time and laughing. They eventually found the Williamses guns. Richard said there was so much money his "dick was hard." Defendant told Lee he had a beautiful house and Lee said they had worked very hard for what they had. Defendant replied, "'[t]hat's too bad.'" The defendants rifled through Peggy's purse, which contained money and credit cards. Peggy heard items being loaded into their motor home.

Peggy testified that there were four people present, and there was always someone "over" them. Richard held the gun on Lee. Peggy told the intruders that she had not seen their faces, and that Lee was partly blind, and hard of hearing, and said not to kill them. Defendant responded, "'they all say that.'" Richard asked Lee his name and where he worked. When Lee said he had worked for Southern California Edison, one of the males

4

said, "'I should blow your fucking head off right now because I had a friend that just broke into Edison and was caught.'"

Richard pulled Peggy's ring off her finger, held it up and said it was a late wedding present (to Tammy). Tammy laughed. Defendant attempted to pull Lee's ring off his finger, and said if he could not get it off, he would cut off his finger. Defendant eventually pulled Lee's ring off his finger. Peggy testified that Richard and defendant wanted to know where the keys to their vehicles were. Defendant left with one of the cars and returned about five minutes later. Richard asked Lee if he had any relatives or friends that would miss him, and how often they came over. Lee said they came over every day.

The incident in the home lasted for 45 minutes to an hour with Richard in charge and giving most of the directives. After the male defendants told the Williams it was time to leave, Richard took Peggy by the arm and helped her up while her hands were tied behind her back. Defendant held Lee, who also had his hands tied behind his back. Peggy asked Richard if she could get some shoes and he said she would not need them and gagged Peggy by shoving socks in her mouth. Lee was also gagged but Peggy did not see who did it. Richard put Peggy face down and defendant placed Lee face down in the motor home with their hands still tied. Richard drove the motor home while defendant stood guard. After Peggy and Lee were secured on the bed, defendant sat up front with Richard. Tammy drove the Williams' truck. Defendant had the gun in the motor home. After Richard stopped the motor home, Peggy was brought up front,

5

ungagged and untied, and was asked to sign their vehicles over. Defendant still had the gun. Richard and Tammy told Peggy what to write in the documents. Defendant took off his mask after they signed the second document. Peggy believed at that point they would be killed. Defendant threw a blanket over Peggy and Lee and they started the motor home again. Peggy was able to untie Lee, and Lee was going to try to "rush" Richard and defendant. Defendant came back and retied Lee, and said not to screw around. As they were driving, Peggy was so scared that she lost control of her bowels. Defendant stated that he "'scared the living shit right out of [her].'"

Eventually, the motor home stopped. Defendant and Richard came back, and they took Lee off the bed first, then Peggy. Defendant and Richard both had guns. Richard said they were going to take them out a little ways, and lay them down and leave them and that they would come back in five minutes and if they moved, they would blow their "'fucking heads off.'" Richard held on to Peggy while Lee was with defendant. Peggy was barefoot but not bound. Lee was bound. Richard said he found a place that they liked because it was low. Lee was laid down first, face down. Peggy was laid down next to Lee, facing him. Peggy put her arm around Lee. Richard then said to Lee, "'Thank you and have a nice day,'" and shot Lee. Within seconds, Peggy heard Lee stop breathing. Peggy was shot thereafter. Defendant made a comment about all the blood running out of Lee. Richard and defendant did not think Peggy was dead. One of them shone a flashlight in Peggy's eyes and the other one felt her pulse. The one shining the flashlight asked the other one if she was dead, and he said he could not tell. The other

6

one then said, "Well, shoot her again," and Peggy was shot again. Peggy played dead and tried not to move. Peggy laid there a few moments after they walked off in a normal manner. Peggy then heard the diesel truck and motor home start up, and the defendants left.

Peggy continued to lie on the ground to make sure they were not coming back. She tried to talk to Lee but there was no response. After Peggy stood up and got her bearings together, she walked towards lights coming from a truck stop. When a sheriff deputy arrived, Peggy told him that her husband had been killed and she had been shot. She was unable to direct him to find Lee.

The following morning, defendant had a wad of money. He also had a blue Pontiac and told people that he had bought a new car.

### 2. Joint Interview of Defendants

The joint interview of all three defendants was admitted in the penalty phase and at the section 1172.6 resentencing hearing. The statements of Richard were considered adoptive admissions. Defendant stated that when they asked him to participate in the robbery, he was "down" but was skeptical. Richard said that they knocked on the door and Tammy said that the car broke down and she needed to call a tow company. Tommy Posey and defendant followed them inside the Williams' home. Tammy said that Richard, defendant and Tommy all had guns. When asked what kind of gun defendant had, defendant said "38."

When asked what happened next, defendant said that they asked everybody to go down to the floor and that he had found guns, rifles, jewelry, and clothes in the bedroom. Richard said he tied up Peggy and defendant helped him tie up Lee. Defendant said they tied them up together, and also said, "I couldn't do it." Richard claimed that he put Peggy in the motor home by himself, and defendant helped him get Lee in. Richard said they were in the house for approximately two hours. Defendant said he left in the blue Pontiac and parked it down the street.

When asked what happened when they got to the desert, defendant said, "tied them up, put them in the desert." Then he started walking back, turned around, and the people were shot. "Rich told me that, uh, she's not dead. To do it again. Then check to see if she had died." Richard said that defendant was standing about four steps behind him when he shot them and that defendant was holding a flashlight. Richard said that Peggy did not have a pulse and he thought she had died. Richard he did not think she would get up and walk away. Defendant denied saying "shoot her again." Richard said it might have been him who said that. Defendant stated that his gun was not loaded. Defendant took money out of Lee's wallet before he was shot.

3. Little Ceasar's Robbery

In the penalty phase, the People presented evidence that Richard and defendant had robbed Little Ceasar's on November 14, 1992, shortly before the murder/attempted

8

murder.  The resentencing court specifically commented that he relied on this robbery, in which defendant was armed with a gun, to support the findings of ineligibility.[3]

Joseph Gill testified that he worked as the assistant manager at the Little Ceasar's in Barstow.  On November 14, 1992, he was working with James Franklin.  Gill had met Richard a week or so earlier through the Posey family, and he had met defendant three or four days earlier.  Richard asked Gill questions about the store and told him he was going to rob it.  Gill testified that he did not want to know about the robbery or cooperate, but Richard showed him his gun and told him he would kill him, his wife, and his child.  Richard told Gill not to make the regular deposits into the safe.

On November 15, 1992, Richard and defendant went to Little Ceasar's and ordered pizza about 10 minutes before closing time.  They left, and when they returned, defendant came in first.  Defendant pulled a gun and said, "'It's a robbery mother fuckers.'"  Defendant cocked the gun, pointed it at Gill and told him to open the cash drawer.  Gill opened the door and saw Franklin on the ground. Defendant hit Gil with the gun on his shoulder, and Richard told Gill to get on the ground.  Richard dragged Franklin's girlfriend by the hair through the employee entrance, and threw Franklin and his girlfriend on the ground.  He then put a knife to their throats, took Franklin's wallet and told him that if he went to the police, he would hunt him down and kill him.

Meanwhile, defendant was trying to get Gill to open the safe.  Gill said he did not have access to it, and defendant hit Gill to the ground.  Defendant was yelling "slang"

_____

[3] "4RT" denotes the reporter's transcript from the resentencing hearing in the current appeal.

9

and told him to put money in the bag.  Defendant and Richard walked Gill and Franklin to the back of the store, and told them not to come out for five minutes.  Once they left, Gill hit the silent alarm.  Franklin realized later that the gun was not loaded because a shell did not eject.

### 4.  Defendant's Testimony at the Resentencing Hearing

Defendant testified at the resentencing hearing that he was 19 years old at the time of the crimes.  He made friends easily, and became friends with Richard.  He met Richard at Barstow Community College.  Richard was a few months younger than defendant.  They had common interests, including that Richard was going into the military, which defendant was also interested in.  They had been friends for one and a half to three years.  Richard had been kicked out of the military and was a different person thereafter.  Prior to that, he was not violent and had not done anything crazy.

In regard to the murder/attempted murder, defendant testified that Richard had asked him if he wanted to help with a burglary, and he agreed.  He did not remember a conversation about committing a robbery.  They did not discuss having weapons, and no one was supposed to be home and they were going to enter a side door.  When they got there, they discovered someone was home.  Initially, he did not want to go through with it, and they went down the road to talk about it.  Richard said there were just two people, and they could go in and do a robbery and that Tammy knew the people.  Defendant claimed that he did not want to be there, but did not want to be the one that was like "'Oh, you're a punk'" so he went along with it.

10

Richard supplied them with weapons. Defendant admitted having a gun but it was not loaded. Tammy knocked on the door, and when Lee answered, she said her car broke down and she needed to use the phone. When she entered, Richard and Tommy Posey, who was 15 years old at the time, followed behind. Defendant was on the side of the door with a ski mask on, rolled up like a beanie. He pulled it down and went in the house. When he got inside the house, Peggy and Lee were on the floor. Tommy was told to keep an eye on them, and Richard told defendant to look for duct tape. Defendant and Richard looked around but did not find any duct tape. Richard then pulled shoestrings out of some shoes and tied up the Williamses. Defendant just stood there, and Richard told him to go rummage through to look for valuables. He went to a bedroom and emptied out clothes but could not find anything. Richard saw a safe, and untied Lee so he could open the safe, then he tied him back up and continued searching the residence. Richard told defendant to go and look in the safe and defendant pulled everything out of the safe. Richard went to the garage, saw two cars in the garage and asked defendant if he wanted one and he said he did. Richard told him to take the car (a Pontiac LeMans), drive it somewhere, stash it, then come back to help him put stuff in the truck, which Richard wanted to take.

Defendant retrieved the car keys, gave the .38 gun Richard had given back to Richard, then took the car about a mile and a half, parked it in front of a pizza place, and walked back. He was gone about 20 to 30 minutes. When defendant returned, Richard and Tommy were moving the Williamses into an RV. The truck was attached to a horse

11

trailer. Defendant asked Richard what was going on and Richard said the burglary had turned into a kidnapping, and they were going to take them to the desert and leave them there, so they had time to get away. Defendant just wanted to get it over with and believed the Williams would be okay and no one was going to get hurt. Defendant helped Peggy into the RV, and Richard took Lee. Tommy drove the car they had arrived in, and the others headed into the desert. They stopped at Tommy's residence, where Richard and Tammy were staying. Richard said he was going to have Tammy make some "bill of sales" in case they got pulled over. The "bill of sale" for the Pontiac was made out in defendant's name. Richard untied Tammy and brought her to the front of the RV, and had her sign the "bill of sales." They then drove to the desert.

Once they were in the desert, Richard brought Lee out of the RV and had his gun. Defendant escorted Peggy out. He untied her to be next to her husband and "laid them down." Richard told Peggy to wait 10 minutes before she got up to leave to give them time to get away. He turned to leave and heard a shot. Then he turned around and Richard had a flashlight and was looking at Peggy and shot her again. Defendant said he did not know what to do and just left. He did not try to stop what was going on because he did not have a gun and had just witnessed Richard kill someone in cold blood. Defendant claimed he did not want to be there in the first place, things had escalated, it was supposed to be a burglary and kept snowballing. He wanted the night to be over.

On cross-examination, defendant testified the plan was that they would all have guns, and he knew he would have contact with the Williamses, and that he would have to

12

force them to the floor at gunpoint. He denied tying anyone up, but admitted that in the joint interview that they said they tied them up together. He explained that "at the end of the day, I couldn't." He testified he did not know Richard would be violent. When he decided to commit the robbery, they were going to tie them up and leave them in the house, take their belongings and leave. He did not intend for them to be harmed or kidnapped, and has lived with the shame of his actions for 32 years.

Defendant testified that it was Richard who said, "'they all say that'" after Peggy said she had not seen them and asked not to kill them. Richard removed Peggy's wedding ring. Defendant denied removing Lee's ring. Tommy said that if he could not get the ring off his finger, he was going to cut his finger off. Defendant admitted that it was his intention to place the two elderly victims in the middle of the desert at night in cold weather and leave them there. After Peggy soiled herself, Richard made the comment that he scared the shit out of her. Defendant did not recall Richard saying he could not tell whether Peggy was dead, and defendant saying, "'then shoot her again.'" Richard and Tammy dropped defendant off at the Pontiac. Defendant received about $400 from the robbery.

B. *Procedural History*

In January 1996, in a joint trial with defendant and codefendants Richard and Tammy Gamache, a jury convicted defendant of one count of first degree murder (§ 187, subd. (a); count 1), one count of attempted murder (§§ 664/187; count 2), two counts of residential robbery (§ 211; counts 3 and 4), one count of residential burglary (§ 459;

13

count 5), and two counts of kidnapping for robbery (§ 209, subd. (b); counts 6 and 7). In addition, the jury found true special circumstance allegations that the murder was committed while the defendant was engaged in the commission of a residential robbery (§ 190.2, subd. (a)(17)(i)), first degree burglary (§ 190.2, subd. (a)(17)(vii)), and kidnapping for the purpose of robbery (§ 190.2, subd. (a)(17)(ii)). The jury further found true that defendant personally used a firearm (§ 12022.5(a)) in the commission of all the counts. Defendant was sentenced to life without the possibility of parole for the murder; life with the possibility of parole for the attempted murder and each of the kidnapping for robbery counts; and stayed determinate terms for the residential robbery offenses. (See *People v. Ramnanan* (Oct. 7, 2022, E077536) [nonpub. opn.] (*Ramnanan II*).)

On June 29, 1998, we affirmed defendant's convictions and sentence. (See *People v. Ramnanan* (Jun. 29, 1998, E018243) [nonpub. opn.] (*Ramnanan I*).)

On February 21, 2019, defendant sought resentencing pursuant to section 1172.6. The trial court summarily found defendant was ineligible for resentencing and denied the petition. On October 7, 2022, we reversed the trial court's order denying defendant's section 1172.6 petition and remanded the matter for further proceedings. On remand, we directed the trial court to issue an order to show cause and, to the extent necessary, hold an evidentiary hearing on the petition. (*Ramnanan* II, *supra*, E077536.)

On remand, the trial court appointed counsel, issued an order to show cause and held an evidentiary hearing.

Following briefing by the parties, the evidentiary hearing was held on December 13, 2024. At the hearing, the trial court took judicial notice of prior testimony, including the preliminary hearing, the trial testimony, and the penalty phase testimony. The court noted that it disregarded any portions of the preliminary hearing testimony that were inadmissible. The court also relied on a joint interview of all three defendants that was admitted at the penalty phase, and considered defendant's silence as adoptive admissions.

After defendant's testimony and argument by the parties, the court denied defendant's petition, finding that as to the murder and attempted murder, defendant was guilty as an aider and abettor that acted with express malice and thus had the intent to kill. The court found there was no "debate" that defendant was a major participant, in that he was a coparticipant prior to and during every aspect of the crimes. The court explained that defendant was part of the planning, he carried a weapon, and he had past experience with Richard, noting it was "aware" defendant was "only 19 years old at the time of these crimes." The court also noted that defendant was in a position to prevent the death, and his action/inaction played a role in the death. The court also found defendant acted in reckless indifference to human life in that he participated in, helped create, and knew there was a grave risk of death to both victims. The court explained that defendant was aware and understood what was going on and chose to participate. The court, in addressing the pertinent factors, found that defendant knew that guns would be present, he knew they were likely to be used, if not when it started, then when they walked into the desert, he knew the number of weapons involved, was physically close

15

when the murder occurred, had an opportunity to stop the crime, and that the crimes were long in duration—it was a planned home invasion that took hours, significantly increasing the risk of harm and the chance the victims would be killed. The court noted that defendant left the scene and came back, the kidnapping significantly increased the risk of harm, and defendant did not try to minimize the possibility of violence. Defendant timely appealed.

III.

DISCUSSION

After defendant appealed, upon his request, this court appointed counsel to represent him. Upon examination of the record, counsel has filed a brief under the authorities of *Wende*, *supra*, 25 Cal.3d 436 and *Anders*, *supra*, 386 U.S. 738, and not under *Delgadillo*, *supra*, 14 Cal.5th 216, setting forth a statement of the case, a summary of the facts and potential arguable issues and requesting this court to conduct an independent review of the record. Under *Anders*, which requires "a brief referring to anything in the record that might arguably support the appeal," (*Anders*, at p. 744) counsel raises the issues of whether there was substantial evidence to support the trial court's denial of defendant's claim and whether the trial court erred in considering the joint interview of all three defendants that was submitted in the penalty phase.

We offered defendant an opportunity to file a personal supplemental brief, and he has done so. In his brief, defendant appears to argue there was insufficient evidence to support the court's finding he was a major participant who acted with reckless disregard

to human life and the court should have considered his youth as a factor, which was relevant to the requisite mental state for felony murder.

"Effective January 1, 2019, the Legislature passed Senate Bill [No.] 1437 [(2017–2018 Reg. Sess.)] 'to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' [Citation.]  In addition to substantively amending sections 188 and 189 . . . , Senate Bill [No.] 1437 added [former] section 1170.95, [now section 1172.6,] which provides a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*People v. Lewis* (2021) 11 Cal.5th 952, 959.)

Under *Delgadillo*, if a no-issues brief is filed in a section 1172.6 appeal and the defendant then "files a supplemental brief or letter, the Court of Appeal is required to evaluate the specific arguments presented in that brief and to issue a written opinion." (*Delgadillo*, *supra*, 14 Cal.5th at p. 232.)  We are not required to conduct "an independent review of the entire record to identify unraised issues" but may do so at our discretion. (*Ibid.* ["While it is wholly within the court's discretion, the Court of Appeal is not barred from conducting its own independent review of the record in any individual section 1172.6 appeal."])

Counsel contends this appeal should not be limited to the review process of *Delgadillo*, since it follows an order to show cause and evidentiary hearing.  Instead,

17

counsel argues we should independently review the record for error as establish by *Wende*, *supra*, 25 Cal.3d 436. Counsel invites the court to distinguish this case from *Delgadillo*. We decline the invitation to discuss the scope of the court's opinion in *Delgadillo*. As noted above, in that case the court authorized appellate courts to exercise their discretion to conduct a *Wende* review where the court's find it appropriate. We have elected to exercise our discretion to independently review the record following the guidelines established in *Wende*. In addition, defendant here has filed a supplemental brief. Further discussion of the scope of *Delgadillo*'s review is not necessary.

At an evidentiary hearing held on a section 1172.6 petition, the trial court may make factual findings and credibility determinations, and weigh evidence. (See *People v. Harden* (2022) 81 Cal.App.5th 45, 51.) "[I]t is the prosecution's burden to prove beyond a reasonable doubt that the petitioner is ineligible for resentencing. [Citations.] If the superior court finds beyond a reasonable doubt that the petitioner is guilty of murder notwithstanding the amendments to sections 188 and 189, the petitioner is ineligible for relief under section 1172.6." (*People v. Vargas* (2022) 84 Cal.App.5th 943, 951 (*Vargas*).)

We review the trial court's factual findings for substantial evidence. (*People v. Underwood* (2024) 99 Cal.App.5th 303, 314.) "We ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable

18

doubt." ' " (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.)  We " ' "presume[ ] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' [Citations.]  Substantial evidence also ' "includes circumstantial evidence and any reasonable inferences drawn from that evidence." ' " (*Vargas*, *supra*, 84 Cal.App.5th at p. 951.)  "Our job is only to see if substantial evidence exists to support the [trial court's ruling] in favor of the prevailing party, not to determine whether substantial evidence might support the losing party's version of events." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582.)

Here, the trial court properly followed the procedures governing section 1172.6 petitions.  And its order denying defendant's petition after the evidentiary hearing is supported by substantial evidence set forth in the trial transcripts.  Specifically, substantial evidence supports the trial court's finding that defendant was a major participant and acted with reckless indifference to human life.  (See *People v. Banks* (2015) 61 Cal.4th 788, 803.)  The evidence at trial established that defendant participated in the burglary, robbery and kidnapping for a long duration of time that led to the murder.  Substantial evidence demonstrates that defendant had agreed to participate in the robbery with firearms, defendant had actively participated in tying up the victims and kidnapping them, and defendant was present when Richard asked the Williams if anyone would miss them and thus knew the ultimate plan was to kill the victims.  Defendant was present when Peggy asked if she could retrieve shoes and Richard told her she would not need them.  Defendant did not object and thus understood the victims would be killed.

19

Defendant did nothing to prevent the crimes or murder and attempted murder and had in fact left but returned. When he left, he could have called for help and reported what was occurring. In addition, it would have been self-evident to defendant that Richard had a propensity for violence as defendant had participated in an earlier violent robbery of Little Caesars. While defendant did not shoot the victims, he was present at the scene when the victims were shot, he knew Richard had a loaded firearm, he had participated in the burglary, robbery and kidnapping beforehand, had tied up the victims and escorted them to the motorhome, he had held a flashlight to determine whether Peggy was dead, and he did nothing to help the victims, and stop the eventually death of the victims or call the police when he left earlier with the Pontiac.

The substantial evidence set forth above also supports the finding that defendant acted with reckless indifference to human life. (See *People v. Clark* (2016) 63 Cal.4th 522, 615; see also *People v. Strong* (2022) 13 Cal.5th 698, 706 ["the major participant and reckless indifference elements often ' "significantly overlap" ' "].) The duration of the crime was prolonged. Defendant was present throughout most of the sequence of events, had an extended opportunity to try to persuade his confederates not to kill the victim, took no efforts to minimize the risk of violence, and took no efforts to aid the victim. Instead, as just discussed, defendant himself participated in the burglary, robbery and kidnapping that led to Lee's death and attempted murder of Peggy.

In sum, substantial evidence supports the trial court's conclusion beyond a reasonable doubt that defendant was guilty of murder and attempted murder under the

20

current law and was thus ineligible for relief under section 1172.6. There are no reasonably arguable issues on appeal.

Defendant contends his youth should have been considered at the section 1172.6 evidentiary hearing because it was relevant to his mental state for murder, citing *People v Pittman* (2023) 96 Cal.App.5th 400 (*Pittman*). The court here, however, considered defendant's youth but rejected that factor in finding defendant was a major participant who acted with reckless disregard to human life in the commission of the murder and attempted murder. The court specifically stated "[Defendant], I know that you are not the same person who was a part of this. I am aware of how young you were at the time. I watched the videotape. You were just a young 19-year-old, I know that." The court also noted that defendant was remorseful on the day he was arrested, as well as on the date of the evidentiary hearing.

Furthermore, unlike in *Pittman*, the facts of the offense here do not suggest defendant "acted impulsively," that the crime was "spontaneous," and/or that it occurred as a result of "happenstance." (Cf. *Pittman*, *supra*, 96 Cal.App.5th at p. 418.) The evidence also does not suggest the crime was motivated by "peer pressure." (See *People v. Oliver* (2023) 90 Cal.App.5th 466, 489.)

We have exercised our discretion to independently review the record for error consistent with the process mandated by *Wende* and *Anders*. We have not discovered any arguable issues for reversal on appeal. Competent counsel has represented defendant on this appeal.

21

IV.

DISPOSITION

The trial court's postjudgment order denying defendant's section 1172.6 petition for resentencing is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON _____
J.

We concur:

RAMIREZ _____
P. J.

McKINSTER _____
J.